71851 Jose Sero-Algarin v. Hima San Pablo Caguas Mr. Ruiz, good morning. Good morning. Good morning to you all. My name is Roberto Ruiz Comas. I am the attorney for CMT Hima San Pablo. The crux of the appeal that I am presenting in this particular case has two components. First of all is the factual component as to whether the jury had sufficient evidence to find that CMT Hima San Pablo was negligent in this case and had to respond to plaintiffs for the damages. The second argument is a legal argument and it goes into the matter regarding the Marcano-Rivera case, Gasparini and the new application and the application of precedent, damages precedent in Puerto Rico according to the late Supreme Court decisions in 2016 and 2012. Let me address first the factual matter. There was two allegations as to Hima. First there was a direct allegation of direct liability as to Hima's personnel regarding the CPR and the ACLS when the patient went into cardiorespiratory arrest. There is no doubt in the record that the jury pursuant to the evidence presented in the case found that there was no liability as to that particular portion of the case because the testimony that was presented by plaintiff regarding that matter and their expert had been obtained not from the medical record but from the testimony that was given by one of the relatives of the plaintiff of the case. Dr. Dreyfus, which was plaintiff's expert, had to admit at that point in time that he had not seen or he has not evaluated or taken into consideration what the record said concerning the timeframe when the CPR and the ACLS was done with the patient once the green code was called. The testimony from plaintiff is that it took 10 to 20 minutes for them to respond to the green code. But the objective evidentiary documentary evidence presented in the case showed that the response time was two minutes. In two minutes the green code was responded by the Hima personnel. Isn't there uncertainty? It may have taken only two minutes for the CPR personnel to respond once there was a call for help. But there is some uncertainty about how long it took Dr. Rocha to call for help. And isn't there testimony that he waited maybe 15 or 20 minutes to call for help? And I think Dr. Dreyfus said that was the problem. He waited too long to call for help. Yeah, but the thing is that if that would have been the case, as our expert testified, if this gentleman had been 15 to 20 minutes without oxygen support to the brain with these conditions that he had, he would have been dead. He wouldn't have survived. The only reason that this patient survived was because the response team responded within two minutes and eventually was able to get the patient back with circulation. So why do you focus on this response time? Do you think that's the only basis upon which the hospital could be found liable? No, no. I just wanted to cover everything that was the other basis. But before you move to the other basis, I don't even understand this argument because you're focusing on the record, which is nothing other than the recorded recollection of one set of witnesses, and you're saying that that should have more weight than the oral testimony of another set of witnesses who present a contradictory story. And the jury heard both presentations of evidence, and so they had the right to determine what was believable. Simply because it was recorded as a medical record doesn't necessarily mean it's true. Well, the thing is that if that was the case, the plaintiff's expert should have said that he gave more credence to what the plaintiff's relative said instead of what the medical record said, but he never said that. Instead he said, I didn't take into consideration whatever was said in the medical record. But what is important here is what our expert testified concerning the time frame. If he would have taken that much time, the patient would not have survived. Now, what I was going to address is Judge Lippert's question regarding whether there was another instance where the hospital could be held liable. And the focus of that liability turns into Dr. Roca. Dr. Roca was an intern that applied to an intern program at the hospital. He had been accepted to work at the hospital in the intern program that the hospital sponsors. Dr. Roca started his intern program in the hospital in July. The first department he did his rotation was surgery. He started his surgery rotation with Dr. Aponte. When the events of this case … Counsel, so what? When the patient approaches the hospital, he's not concerned about these nuances of the relationship between the chief of a department, the interns, the residents. He comes to the hospital believing that whoever gives him care is going to give him proper care. The record seems to be clear that although he may have had a relationship with Dr. Aponte before, that's not why he came to the hospital. He came to the hospital because he was in distress and you came there hoping to get some relief. So why does any of this detail matter? I don't say it doesn't matter and I addressed that particular point in my brief. I said in my brief that it's not happenstance that Mr. Suero went to Imacawas. Imacawas has been the hospital that he has been hospitalized before. His primary intern is work at Imacawas. Even if there's no evidence that they called him to go there to the hospital, it is, in my opinion, it is not a coincidence that instead of going to other hospitals that are in the area, he went to the hospital where his intern is working there. The surgeon that attended him there worked and attended him in his office. Okay, but that doesn't transform the nature of the hospital's responsibility towards him as a patient just because he's been there before or because doctors associated with the patients have a relationship with the hospital? Well, in Puerto Rico, I think it has a relevance because if the patient went there looking for a particular physician that had attended him before or a patient of his, then the responsibility changes because then you have to find whether that physician, the liability to the hospital is whether there's a history that that physician had committed an act of malpractice before, that they did not monitor his work before, and that is very important in this case. If he did not go to that emergency room by chance and he went there because physicians that have attended him were there working there, their responsibility is different as to the hospital. But I got to go back to the point of the intern. I understand your point, Judge, that the patient goes there and it doesn't matter whether the intern was there or not. But the fact of the matter is that the only reason that the intern intervened in this particular case with this patient was not because he was working as part of the internship program of the hospital. In the record, there is a letter of Dr. Aponte, the surgeon who had placed the catheter on the patient and has stated to the hospital, I'm going to use Dr. Roca, the intern, I'm going to use him in his free time, and the only things that he's going to do are physical examinations, progress notes, discharge summaries, and the other one was I'm passing rounds with him. He limited the scope of his participation to that. The hospital cannot foresee or could not have foreseen that Dr. Roca was going to be sent by Dr. Aponte to perform that procedure. The letter was three days before this event happened. And the hospital, the only knowledge that he had was that Dr. Aponte was going to use him on his free time. But more importantly, as to the relationship, either as an employer-employee or agent or principal, in this particular case, Dr. Aponte became his employer, his agent, his principal, because Dr. Aponte told the hospital, I'm going to use Dr. Roca in his free time, I'm going to pay him, I'm going to make sure that he doesn't do surgeries, and I will be supervising him as to whatever he's going to do in the scope, in the limited scope that he set. So you seem to be describing a situation where these co-defendants, I mean, the hospital might have had a good basis for some kind of cross-claim against Dr. Aponte. He misrepresented from your argument what Dr. Roca was going to be permitted to do. He then sort of on an ad hoc basis allowed him to do something that he never told the hospital he was going to allow them to do. But again, I don't see why any of this should matter with respect to the plaintiff who went to the hospital, believing that whoever gave him the care would give him the proper care. Now, you may want to argue that he actually went there not because of his faith in the hospital, but because of his faith in Dr. Aponte. But isn't that really a factual dispute? I mean, I assume that you tried to argue the basis upon which he went to the hospital. Well, it's factual in the sense that the testimony that they presented contradicts what was the known fact that these physicians had attended this patient before, had attended them in their office. But it's a legal argument. It is a legal argument because the responsibility is different. When the patient goes in directly to the emergency room, vis-a-vis when he doesn't go there because when he goes there because he knows the physician there, the physician there has a relationship of patient-doctor with him. So my point as to this particular aspect is the jury found that the hospital was liable 10%. Excuse me. There's a question that I would like to ask at some point. I think this is a good time to interrupt. Does the record show what kind of problems this doctor has had at the prior hospital? I saw something about 14 problems. No. Oh, that's the Dr. Roca. That particular point. Is it in the record? What? Does the record show what kind of problems this gentleman has had? The record, well, partially yes and partially no because I objected to that evidence because I thought that it was irrelevant and prejudicial under Rule 403 because what happened with Dr. Roca in Texas was a totally different situation than in Puerto Rico. In Texas, there was – Well, was it admitted? What? Did the court admit it? The court did not admit the record in Texas. But there was reference, even with my objections, there was reference to the complaints that afterwards were called incidents, 14 incidents. And the incidents were not related to Dr. Roca's performance as a medical assistant in Texas. It was because he was – the complaints there or the incidents there, he was portraying himself to be a physician when in Texas he was not a physician. He was a medical assistant. Well, was there an improper credentialing argument? Right. Was there an improper credentialing argument that was permitted or did your successful objection – I was successful in the objection regarding the matter concerning the 14 instances and the record in Texas. The judge allowed questions after the vetting or the vetting of the candidate into the hospital. However, what was relevant as to that particular case is that in Puerto Rico, Dr. Roca had been granted a provisional license as a physician to work in the intern program. But the problem in this case is not what he did in the intern program at EMA, because there's no allegation as to that. The problem was that Dr. Roca, pursuant to Dr. Aponte's request, went to do a procedure at a room that the letter that Dr. Aponte had given to the hospital did not specifically state that he could do. And the hospital had no way of knowing that. So that's the reason that I believe that the 10 percent that was allocated to the hospital liability is not supported by the evidence. That's my position as to that. Could you just tell us why the hospital would not have known about a procedure that's taken place under its roof? No. The hospital doesn't know in terms of what Dr. Aponte is going to do or not with the procedure. The hospital – this is a Sunday. This happened on a Sunday. The night before, the day before, Dr. Aponte had called Dr. Roca and told him, you're going to go to patient Suero's room and you're going to take out a catheter line from his body. The hospital doesn't know that. The hospital doesn't know that Dr. Aponte had called Dr. Roca. The hospital didn't know that Dr. Roca was going to go there on Sunday morning. Of course, when he got there physically, he went into the room. But even there were no nurses present when this happened. The hospital had no way of knowing this. And that's the reason I believe – Does the hospital have any duty to vet this doctor? Dr. Roca? Yes. The hospital did vet Dr. Roca. I don't know if I got the right number. The right what? Dr. Roca is the one that did the pulling. Yeah, Dr. Roca is the intern. Okay. Did the hospital vet this doctor to see what his qualifications were? The hospital had in the record the qualifications of Dr. Roca in the state of Texas. The hospital obtained a lot of documentation that was provided regarding his prior experience. The hospital, in terms – the only thing that the hospital doesn't do but is done by the Puerto Rico Department of Health is that when Dr. Roca applies for a provisional license in Puerto Rico, he has to provide also information concerning his prior history in terms of experience and the credentialing in terms of the examinations that he took. Dr. Roca had already passed the boards when he – the UMSL. He had already passed the three parts of the boards, of the national boards in the states. He was qualified to participate as an intern in the program. And precisely because of that, he was working there. Dr. Roca ended with a 98% score in the internship program at the hospital. But he had that incident that happened with Dr. Aponte that he was doing on his free time, to work for Dr. Aponte and TBG, the two other defendants that were here until two days ago. So my position is that the 10% allocated to the hospital is not supported by the evidence. That's my position as to that. Now – Time is up. My time is up? Yes, thank you. All the – this is important for sure, all this detail about the credentialing of Dr. Roca, what the hospital knew about his past experiences in Texas and so forth. Unless – unless the proper view of what happened here is that the patient came to the hospital, entrusting his care to the hospital. And if that is the basis upon which he came under the law of Puerto Rico, the hospital is jointly liable with the physicians who committed the malpractice. Isn't that a fair statement? It is a fair – it is the state of the law in Puerto Rico. Okay, so – It is the state of the law in Puerto Rico, but I defer, as I have explained before, I defer as to the way that the patient arrived at the – So who – you put that in issue. Who made the judgment? Was it the judge or the jury? Who made the judgment about the basis upon which the victim, the deceased, came to the hospital? There are two theories, I gather. One, he came there, he was in tough shape, and he needed emergency help. You're saying that's only part of the story. He had a number of choices of hospitals to go to. He went to the hospital. He did. Okay, so it's your theory that under the law of Puerto Rico, this is a situation where, in effect, the doctor said to him, you go to that hospital, I want to take care of you there. And so this whole theory of joint liability does not apply in this situation. Is that your argument? Well, partly it's my argument. The only thing that is not factually correct is that the doctor told him go to the hospital because the family relatives didn't call the doctor. He just went into the emergency room, and he already, and Dr. Lora, Dr. Lomita Lora, which was the internist, was the one who admitted the patient to the hospital. And he was the private physician of the patient and had attended him three years before at the hospital for another medical condition. I just want to, I know that my time is up. What's up? Can I just mention? I just wanted to ask a follow-up question if I might, because I'm trying to figure out, is there anything in the record that suggests that when he presented himself at the hospital, he and his family, that he made mention to anyone, is there anything in the records that says, I'm here because of the relationship of this hospital to my doctor? No. There's no evidence in the records specifically that the family relatives said that. Okay. So from the perspective of the hospital, all they know is that they have a patient presenting in distress that they've got to care for, and all of this other stuff seems just to be after the fact. Well, the only thing that I can counter to that argument is that the hospital has many internists admitting patients at the hospital when the patient goes to the emergency room. But it's not a coincidence that the medical internist that attended the patient was a medical internist who was the patient's private physician. This is not coincidence, because they could have put any other of the internists on call to attend the patient. So I don't have any evidence because the record doesn't say it, but for sure, in my opinion, the only way that this could have happened, that Dr. Lora came to attend the patient, was because he was the patient's private physician. And I wasn't going to argue about that. That's a pretty big assumption. I mean, that's just a lot of speculation on your part. I don't want to say it's speculation. The logical conclusion would be that if Dr. Lora hadn't been the person assigned, that he wouldn't have been admitted to the hospital, and that doesn't make any sense either. If Dr. Lora wasn't the intern assigned, that you're saying somehow that it logically follows that but for Dr. Lora's presence, the guy wouldn't have been admitted to the hospital, but that doesn't make any sense. I'm not saying that. What I'm saying is that if the patient did not have any physician that he knew from the hospital, they would have assigned somebody else. But they already knew that Dr. Lora was working at the hospital. They already knew that Dr. Lora had been the private physician of the patient. So that's my opinion as to that. You've already gone over six minutes. We'll take the rest of it on your brief. Okay. Thank you. Mr. Soler. Good morning, Your Honors. May I please record? Pedro Soler Muniz for our respondent. It is perfectly clear from the evidence in this case that the patient was taken by one of his sons directly to the emergency room of IMA Hospital in Cagas. IMA had been this patient's hospital in previous occasions. There was absolutely no evidence whatsoever presented by either of the co-defendants in this case that they reached out to either Dr. Lora or Dr. Raponte before going into the emergency department. And the patient just went into the emergency department with an infection in his legs. He didn't know what kind of treatment was required to treat that condition. He didn't know whether Dr. Raponte needed to place a central line on him or something. Actually, that expired a couple of weeks after that. He had no idea that he needed Dr. Lora as an intern in his case. There's no kind of relationship between the fact that this patient came into the emergency department of IMA on that day and the fact that Dr. Lora, by chance, was there covering a shift at the emergency department. Counsel, this issue, the basis upon which the deceased went to the hospital, was this put in controversy either before the judge or before the jury? At no point in time, Your Honor. There was no evidence in trial stating that the patient went to the hospital due to any sort of contact or reference to Dr. Lora or to Dr. Raponte at all, Your Honor. So I guess your position is in the absence of any such evidence, this theory of joint liability under Puerto Rico law is what should apply. Under Marquez-Vegas case of Puerto Rico. That is correct. So beyond that, counsel here argues that IMA hospital is only liable here for 10%. And we argue that is not correct. IMA here is liable for 40% because on the verdict, IMA was placed liable for 10%, but Dr. Roca, who was the hospital's intern, who was in the fault in the case and did not come to trial, he was found liable for 30%. And that's the point that counsel did not address. So under the theory that Roca was the intern at the hospital, under the hospital's guise, and I will advance that he was not correctly vetted by the hospital, the hospital is liable for Dr. Roca's negligent acts because he was the intern. Dr. Roca had obtained a provisional license as a doctor only to work at IMA. Dr. Roca did not obtain a medical license or provisional medical license as an intern to work with Dr. Aponte. And as a matter of fact, if IMA in any shape or form allowed Dr. Roca to work outside of the scope of that license, IMA is also responsible and liable for that negligent act of allowing the doctor to work at IMA but for another doctor. There was no, absolutely no evidence that Dr. Aponte either had an employment contract with Dr. Roca. There was absolutely no evidence in trial that there was any sort of payment from Dr. Aponte to Dr. Roca. So there was no employment relationship and there could not have been because he was not allowed to work with Dr. Aponte. He only had a provisional license as an intern to work at IMA hospital. Also, he was not vetted because there was evidence on a cross-examination to the doctor at IMA that did the vetting of interns. And she admitted in trial, and this was the evidence heard by the jury, that she did not do the background research on Dr. Roca from the Texas Roseville University, the place where, yes? Before you switch tracks here, what did it make of this email though? The email from Dr. Aponte to the hospital saying he's using Dr. Roca in his free time and the email contains limitations as to what he would be allowed to do. Yes. Are you saying that the hospital can't rely on that representation? Or does that somehow shift the responsibility to Dr. Aponte as opposed to the hospital? The hospital cannot assign Dr. Roca to work with Dr. Aponte because he has a provisional license only to work at IMA's internship program. He has no free time because he's a full-time intern at IMA. Beyond that, on that letter from Dr. Aponte to the hospital and from the hospital back, there are several limitations. Dr. Roca could not touch a patient. Dr. Roca was limited to following another physician, taking progress notes, being at the rounds, being at the examination. He could not pull out a cardiac catheter from a patient, less even doing it on his own, alone. So to allow IMA to pass its responsibility of a private, of an intern with a provisional license to another doctor to perform medical procedures, that is IMA's obligation. Why are you going into all this detail, counsel? I mean, this is really an alternative theory of liability that you're addressing now. Is that correct? Yes. Your primary reliance is that none of this detail matters, that having gone to the hospital on the basis you say he went to the hospital, anything that was done to him improperly there by an intern, a resident, a doctor, the hospital is liable for all of that. That is your basic argument. That is correct. I just want to point out there may be a principal source of liability from the patient going into the emergency room and a subsequent liability of Dr. Roca's niggling an ax being Dr. Roca, an intern of the hospital. But it falls from the same source of liability. Yes. When you said that actually the hospital should be 40 percent liable, not 10 percent, what is the point of that? There's no cross-appeal here. What are you? No, because Dr. Roca was the hospital's intern. Dr. Roca, the hospital is liable for its intern's ax and niggling an ax. Dr. Roca, the hospital is one for Dr. Roca. So are you asking us on appeal to make some determination about 40 percent liability as opposed to 10 percent? No, I'm just trying to correct counsel's statements here because the verdict was very clear in that it placed liability on Dr. Roca on 30 percent and on the hospital on 10 percent. Okay. And I'm just correcting his statement that our idea of that is that the hospital must also carry Dr. Roca's percentage of liability in this case. That's what we're trying to do here, Your Honor. Coincidences do not make evidence. Counsel talked about that in the fact that the patient went to the emergency room. But I think this point has been covered very well up to now. Counsel stresses the importance of when CPR, actual CPR was started. And upon his Rule 50 motion, he says that there was not enough evidence for a reasonable jury to understand and find against IMA hospital because the expert of plaintiffs, Dr. Dreyfus, testified upon counsel's questions that upon writing his expert written report, he had gathered information from plaintiffs' counsel. Now, what IMA's contention is totally missing is the evidence presented at trial, that Mr. Suero's brother was there. He was a witness. And the evidence was presented to the jury that he saw Dr. Roca come in. He saw Dr. Roca yank out the tube from his chest. Immediately he saw that his brother rolled his eyes back and stopped breathing. And he saw that Dr. Roca took anywhere from 10 to 20 minutes to press the green button to call the CPR. But IMA is not placing any importance on that fact. It is placing all of the importance in the fact that after the button was pressed, what happened afterwards? That someone came in, a nurse came in, two minutes afterwards. Actually, there's ample testimony by our expert, which is on our brief, stating that not even the oxygen bottles were brought in until 25 minutes after the CPR incident started. And that's where our expert, with the evidence that was presented to the jury, opined that the hospital was liable and responsible for the CPR provided by the hospital and from the lack of appropriate calling or timely calling of CPR in this question by Dr. Roca. There is no evidence that either Dr. Aponte or Dr. Lora were working at the hospital when the patient came into the emergency department. It did not show from the medical... Is this 1040 issue the problem that you have in this case? I'm sorry, Your Honor? Is this 1040 issue, is that the problem you have in settling this case? Or 1030? 1030 issue, I'm sorry. Yeah, 10%, 30% liability. Is that what's preventing this case from settling? Realistically? It may. We really don't know, Your Honor. We don't know what the hospital's position in that sense is. Dr. Roca was working for somebody. Exactly. Covered by insurance by somebody. Is the real issue here that you can't settle it is because the insurance companies are fighting about Dr. Roca? Who's covering Dr. Roca? As far as I know, there's no insurance company for the hospital. The hospital is self-insured in some sort of way. Yes, Your Honor. Since the beginning, we've talked about settlement offers, and none of them were entertained. So that's why we were actually forced to go into jury trial. That's the whole issue about that. I don't know what the hospital's position in that may be. Has this case gone before settlement counsel? Yes, we did. And we did have a camp conference with Judge Cordero. And it is my opinion that my clients were very reasonable in that they came down from their original monetary expectations. And it's my opinion that Judge Cordero, I mean, he saw it as well. But it was a very strange camp conference. Well, listen, while we're on the issue of money, the money issue involved in this case, I mean, you're arguing on appeal that the court erred in its remitter. Yes, yes. Well, it is our – And I'm trying to figure out if that's a real appellate issue. No, that's not a real appellate issue. It is our opinion, Your Honor. It is not an issue that we raised to this court so that it may be actually reversed. It is our opinion that having accepted the remittitor, plaintiffs having accepted the $400,000 remittitor that was requested by co-defendants in this case, they now come and try to expound some sort of legal theory to go against the remittitor. So what we're saying here is that, well, if they're trying to go after the remittitor they sought after, it is our opinion that the case, the value provided by the jury in the verdict was a reasonable one. That's why we expounded that in our brief. So you're not saying that acceptance of the remittitor prevents them from filing an appeal, though? No, no, we're not. Of course we're not. They have the right to do that as well. The fact that Dr. Aponte or Dr. Roca worked with some of Dr. Aponte's patients did not disassociate the fact that Dr. Roca was still under EMA's intern umbrella. As I repeated before, there is no evidence of any payment. There is no evidence of any contract or any relationship. And if EMA allowed Dr. Roca to work with Dr. Aponte and commit negligent acts, it is also EMA's fault and liability. That will be all. Thank you. Thank you.